IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-711

No. COA21-674

Filed 1 November 2022

Guilford County, Nos. 16CRS67908; 16CRS67909

STATE OF NORTH CAROLINA

v.

GERARDO AMBRIZ, Defendant.

Appeal by defendant from judgment entered 28 May 2021 by Judge Alyson A. Grine in Superior Court, Guilford County. Heard in the Court of Appeals 22 March 2022.

*Attorney General Joshua H. Stein, by Assistant Attorney General Caden William Hayes, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Kathryn L. VandenBerg, for defendant.*

STROUD, Chief Judge.

¶ 1 Gerardo Ambriz ("Defendant") appeals from a judgment entered upon jury verdicts finding him guilty of one count of trafficking in methamphetamine by possession, one count of trafficking in methamphetamine by transportation, and one count of conspiracy to traffic in methamphetamine by possession. Defendant argues the State's evidence was insufficient to support his convictions and that he was denied the speedy trial as guaranteed under our state and federal Constitutions. Because

the State presented sufficient evidence to submit Defendant's charges to the jury, and because the trial court did not err by denying Defendant's speedy trial motions, we conclude the trial court committed no error.

## I.    Background

The State presented evidence from two law enforcement officers and one of Defendant's co-defendants, who pled guilty and agreed to testify in exchange for a possibly reduced sentence. The State's evidence tended to show that on 6 February 2016, a drug deal involving a trafficking quantity of methamphetamine was scheduled to take place in Greensboro, North Carolina. This deal was prearranged between Mr. Gomez, a police informant, and Mr. Gomez-Macedo, whose street name was "Paco." Paco was connected "to the Atlanta, Georgia, area, [and] knew people in that area that could bring drugs" to Greensboro; he was to provide nearly five kilograms of methamphetamine. On 6 February 2016, the informant and Paco met at a La Fiesta Restaurant in Greensboro. At the restaurant, the informant contacted his handlers with the Greensboro Police Department and worked with Detective Monge, who posed as the buyer, to show Paco $150,000 in "flash cash" to facilitate the deal. "Flash cash" is money managed by individual police departments for the purposes of facilitating these types of transactions, because sellers in transactions of this magnitude often want to observe the money before providing drugs. Detective Monge drove the money to the La Fiesta Restaurant, where the informant and Paco

observed the money. Shortly afterward, the informant and Paco learned the narcotics had been delayed in Alabama. The evidence indicated the vehicle transporting the narcotics was "broken down" or was experiencing "mechanical issues[,]" but also that the driver was stopping to rest. After it became apparent the deal would not occur that day, the informant and Paco left the La Fiesta Restaurant.

¶ 3    Detective Williams with the Greensboro Police Department testified at trial regarding communications between Defendant and Mr. Reyes, another participant in this deal with connections to the driver, the informant, and Paco. Detective Williams also testified regarding the circumstances of the deal. On 6 February, Mr. Reyes sent Defendant a file with the driver's contact information. Defendant responded and told Mr. Reyes, "cousin, tell them they're going to call him on behalf of Pitufo."[12] Later that evening, Mr. Reyes asked Defendant "Are you coming here, cousin?" He then sent a text message to Defendant at 2:17 a.m. the morning of 7 February and told Defendant "he is here in Alabama, cousin. He's going to stop there and rest." Defendant responded to this message: "It is good, cousin." Defendant then sent Mr. Reyes a Georgia address later in the morning, and Detective Williams did not testify

---

[1] The text messages the State's witnesses testified about were originally in Spanish. The text messages were translated as part of the State's investigation. We discuss the text messages as translated and testified to by the State's witnesses.

[2] The Greensboro Police Department did not identify anyone as "Pitufo" during their investigation.

about any other text messages of note.

¶ 4        Later on 7 February, when officers began arriving at the La Fiesta in Greensboro, they noted the informant had already arrived. Shortly after arriving, Detective Williams "observed [the] informant, along with [Paco] and two other unidentified Hispanic males" exit the La Fiesta Restaurant. These two individuals were later identified as Mr. Reyes and Defendant. The group left La Fiesta and shortly afterward the driver arrived in a "gray Toyota Prius" registered in Georgia. When the Prius arrived, Defendant and Mr. Reyes got into the Prius while the informant and Paco got into the informant's rental vehicle, a "gold or tan Chevrolet Suburban." These two vehicles then "traveled in tandem or one behind the other, the Suburban leading the way[,]" until they arrived at a "public storage facility" approximately five minutes from the La Fiesta Restaurant where the informant had rented a unit.

¶ 5        The driver testified about the events inside the storage facility. Upon arriving at the storage unit, the driver "backed up the car inside so the cameras wouldn't see, and Leo [Reyes] told the young man, 'Get out and get the drugs out.'" The driver identified the "young man" as Defendant. But Defendant was unable to exit the Prius because the driver "had activated the child locks, and because [Defendant] couldn't get out and [the driver] wanted it to be fast, [the driver] was the one that took the drugs out." After dropping the drugs off at the storage unit, the driver, Reyes, and

Defendant left and drove to a nearby gas station.

¶ 6        Reyes and Defendant rode to the gas station with the driver inside the Prius. The driver of the Suburban waited at the storage facility for "approximately ten minutes" then drove to the gas station where Reyes and Defendant got into the Suburban. Both vehicles then left the gas station separately, and officers followed the Suburban to another nearby restaurant. While at that restaurant, the informant called the officers, pretending to arrange delivery of the money. Eventually, the driver of the Suburban returned to the storage unit where Defendant and the other participants in the drug deal were arrested.

¶ 7        Defendant was indicted for one count of trafficking in methamphetamine by possession, one count of trafficking in methamphetamine by transport, and one count of conspiracy to traffic in methamphetamine by possession. Defendant was tried three times for these offenses. The first two trials from 3 April 2018 to 6 April 2018 and 19 August 2019 to 26 August 2019 ended in deadlocked juries. Defendant's third trial began on 24 May 2021 and a jury found Defendant guilty on all charges on 28 May 2021. Defendant gave notice of appeal in open court, and a judgment was entered the same day.

¶ 8        The procedural history of this case for purposes of Defendant's speedy trial claim is laid out separately below.

## II.    Analysis

¶ 9    Defendant makes two arguments on appeal. First, he contends the trial court erred by denying his motion to dismiss because there was insufficient evidence to support his convictions. Next, he argues the trial court erred by denying his motions to dismiss based upon violations of his right to a speedy trial.

## A. Sufficiency of the Evidence

¶ 10    Defendant first argues the State presented insufficient evidence to show he participated in the methamphetamine deal. Defendant made a general motion to dismiss at the close of State's evidence, and therefore we address each of defendant's convictions. *See State v. Glisson*, 251 N.C. App. 844, 847, 796 S.E.2d 124, 127 (2017) (This Court has "precedent holding that a general motion to dismiss for insufficiency of the evidence preserves all issues regarding the insufficiency of the evidence, even those issues not specifically argued before the trial court[,]" and a general "motion to dismiss require[s] the trial court to consider whether the evidence was sufficient to support each element of each charged offense.").

¶ 11    In ruling on a motion to dismiss:

> the trial court must determine whether the State has presented substantial evidence of each essential element of the offense charged and substantial evidence that the defendant is the perpetrator. If substantial evidence of each element is presented, the motion for dismissal is properly denied. Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. It is immaterial whether the substantial evidence is circumstantial or direct, or both.

> Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence. The evidence need only give rise to a reasonable inference of guilt in order for it to be properly submitted to the jury.

*State v. Shelman*, 159 N.C. App. 300, 304-05, 584 S.E.2d 88, 92 (2003) (quotations, citations, and alterations omitted).

¶ 12 "In determining whether the State has presented sufficient evidence to support a conviction, 'the trial court is required to view the evidence in the light most favorable to the State, making all reasonable inferences from the evidence in favor of the State.'" *Id.* at 305, 584 S.E.2d at 92 (quoting *State v. Kemmerlin*, 356 N.C. 446, 473, 573 S.E.2d 870, 889 (2002)). Any "[c]ontradictions and discrepancies must be resolved in favor of the State . . . ." *Id.* (alteration in original) (quoting *State v. Bullard*, 312 N.C. 129, 160, 322 S.E.2d 370, 388 (1984)). "However, '[i]f the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator of it, the motion should be allowed.'" *State v. Loftis*, 185 N.C. App. 190, 196, 649 S.E.2d 1, 6 (2007) (alteration in original) (quoting *State v. Powell*, 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980)). On appeal, "[w]hether the State presented substantial evidence of each essential element of the offense is a question of law; therefore, we review the denial of a motion to dismiss *de novo*." *State v. Crockett*, 368 N.C. 717, 720, 782 S.E.2d 878, 881 (2016) (italics added).

### 1. *Trafficking by Possession*

¶ 13        Defendant moved to dismiss the offense of trafficking in methamphetamine by possession of 400 grams or more of methamphetamine. Defendant argues "[t]he State did not present substantial evidence that [Defendant] possessed the drugs." He also argues the State conceded Defendant never actually possessed the drugs, and "[t]he State failed to establish [Defendant] had constructive possession" of the drugs. The State argues theories of constructive possession and acting in concert for this offense. The State contends Defendant's proximity to the drugs combined with his attempted exit from the car to put the drugs in the storage locker constituted constructive possession of the drugs. The State also argues Defendant, the driver, and various middlemen in this case "all acted in concert to transport, possess, and sell the methamphetamine." Because there was substantial evidence to show that Defendant was acting in concert with the other participants of this methamphetamine deal, the trial court did not err by denying Defendant's motion to dismiss.

¶ 14        The State was required to present "substantial evidence of each essential element" of trafficking in methamphetamine by possession. *Shelman*, 159 N.C. App. at 304, 584 S.E.2d at 92. "To convict a defendant of [trafficking in methamphetamine by possession], the State must prove the [D]efendant (1) knowingly possessed . . . methamphetamine, and (2) that the amount possessed was greater than 28 grams." *Id.* at 305, 584 S.E.2d at 93; *see* N.C. Gen. Stat. § 90-95(h)(3b) (2016). "The 'knowing

possession' element of the offense of trafficking by possession may be established by a showing that . . . (2) the defendant had constructive possession, or (3) the defendant acted in concert with another to commit the crime." *See State v. Reid*, 151 N.C. App. 420, 428, 566 S.E.2d 186, 192 (2002) (quotation omitted) (applying North Carolina General Statute § 90-95(h)(3) in a cocaine trafficking case). "Constructive possession [of a controlled substance] occurs when a person lacks actual physical possession, but nonetheless has the intent and power to maintain control over the disposition and use of the [controlled] substance." *State v. Alston*, 193 N.C. App. 712, 715, 668 S.E.2d 383, 386 (2008) (alteration in original) (quoting *State v. Wilder*, 124 N.C. App. 136, 139-40, 476 S.E.2d 394, 397 (1996)). "As to the [State's acting in concert theory], [a] defendant acts in concert with another to commit a crime when he acts in harmony or in conjunction . . . with another pursuant to a common criminal plan or purpose." *Reid*, 151 N.C. App. at 429, 566 S.E.2d at 192 (second alteration and ellipsis in original) (internal quotations omitted).

¶ 15        Because the State presented "relevant evidence that a reasonable mind might accept as adequate to support [the] conclusion" that Defendant knowingly possessed the methamphetamine under an acting in concert theory, *Shelman*, 159 N.C. App. at 304, 584 S.E.2d at 92, we do not need to address Defendant's constructive possession argument. Viewed "in the light most favorable to the State," *id.* at 305, 584 S.E.2d at 92, the State's evidence tended to show Defendant was acting in concert with the

other methamphetamine deal participants. State's evidence showed the following sequence of events: (1) Reyes, an apparent middleman, notified Defendant early in the morning on 7 February, the day of the deal, that the driver bringing the drugs was stopping to rest in Alabama; (2) as testified to by Detective Williams this message was consistent with the 6 February meeting between the informant, and the Atlanta connection, Paco; (3) later that day Defendant met with Reyes and the driver at the La Fiesta Restaurant in Greensboro; (4) Defendant rode together with Reyes and the driver to the storage unit to drop off the methamphetamine; (5) Reyes instructed Defendant to transfer the methamphetamine from the car to the storage unit but Defendant was stopped by the child locks on the driver's vehicle; (6) Defendant left the storage unit with Reyes and the driver for a nearby gas station where Defendant and Reyes transferred to another vehicle, a Suburban driven by the informant, in which they travelled to a nearby restaurant with the informant and Paco to wait for the money; and (7) then Defendant travelled with the group back to the storage unit where they were apprehended by police. Viewed "in the light most favorable to the State," a "reasonable inference[]" drawn from this evidence is that the group, including Defendant, was working together to sell the methamphetamine. *Shelman*, 159 N.C. App. at 305, 584 S.E.2d at 92. Defendant, the driver, and the various middlemen were working together "pursuant to a common criminal plan or purpose" to sell nearly five kilograms, well over 28 grams, of methamphetamine. *Reid*, 151

N.C. App. at 429, 566 S.E.2d at 192. There was substantial evidence to show, as argued by the State, "that Defendant was an active participant in the drug trafficking and sale." Both the "knowing possession" and possession amount elements of trafficking by possession are supported by substantial evidence.

¶ 16      Because there was substantial evidence of each essential element of the trafficking by possession offense, the trial court committed no error in denying Defendant's motion to dismiss as to this offense.

### 2. *Trafficking by Transport*

¶ 17      Defendant was also tried for and moved to dismiss the offense of trafficking in methamphetamine by transport of 400 grams or more of methamphetamine. Defendant's argument here is similar to his argument as to the trafficking by possession offense. Defendant argues "[t]he State did not present substantial evidence that [Defendant] acted together with others with a common purpose to transport the drugs" and the State argues there was substantial evidence to support an acting in concert theory for trafficking by transportation. Defendant also argues the State "relied on speculation and ambiguous facts" to show Defendant was merely present at the transaction and nothing more than a "passive observer" of the methamphetamine deal. Because the same substantial evidence supporting the trafficking by possession offense also supports this trafficking by transport offense, the trial court did not err in denying Defendant's motion to dismiss.

¶ 18     The elements of this offense are similar to trafficking by possession. "To convict a defendant of [trafficking in methamphetamine by transportation], the State must prove the [D]efendant (1) knowingly . . . transported methamphetamine, and (2) that the amount possessed was greater than 28 grams." *Shelman*, 159 N.C. App. at 305, 584 S.E.2d at 93; *see* N.C. Gen. Stat. § 90-95(h)(3b). The "knowing possession element of" trafficking by transport can be proved by an acting in concert theory, and "[a] defendant acts in concert with another to commit a crime when he acts 'in harmony or in conjunction . . . with another pursuant to a common criminal plan or purpose.'" *Reid*, 151 N.C. App. at 428-29, 566 S.E.2d at 192 (citation omitted).

¶ 19     The same evidence above, considered "in the light most favorable to the State," constitutes "evidence that a reasonable mind might accept as adequate to support [the] conclusion" that Defendant knowingly transported methamphetamine in connection with this drug deal. *Shelman*, 159 N.C. App. at 304-05, 584 S.E.2d at 92. The evidence indicated Defendant was engaged in regular communication with one of the middlemen while the driver was on his way to North Carolina with the methamphetamine, and Defendant was present with the driver and middlemen while the methamphetamine was being exchanged for the $150,000. If not for the child locks on the driver's vehicle, Defendant, instead of the driver, would have taken the methamphetamine from the trunk and placed it in the storage unit. A "reasonable inference[]" drawn from all the State's evidence is that the group, including

Defendant, was working together to transport and sell the methamphetamine. *Shelman*, 159 N.C. App. at 305, 584 S.E.2d at 92.

¶ 20          For the same reasons as above, the trial court committed no error in denying Defendant's motion to dismiss as to this offense.

### *3. Conspiracy to Traffic by Possession*

¶ 21          The third offense Defendant was tried for and moved to dismiss was conspiracy to traffic in methamphetamine by possession. Defendant argues the State's circumstantial evidence, and any related inferences, are insufficient to support a conviction. The State argues the sum of the evidence "point[s] unerringly to the existence of a conspiracy." We again disagree with Defendant. The trial court did not err in denying Defendant's motion to dismiss.

¶ 22          This Court in *State v. Glisson* summarized the State's burden to show a criminal conspiracy well:

> "A criminal conspiracy is an agreement between two or more people to do an unlawful act or to do a lawful act in an unlawful way." *State v. Bell*, 311 N.C. 131, 141, 316 S.E.2d 611, 617 (1984) (citation omitted). To prove the crime of conspiracy, "the State need not prove an express agreement;" rather, "evidence tending to show a mutual, implied understanding will suffice." *State v. Morgan*, 329 N.C. 654, 658, 406 S.E.2d 833, 835 (1991) (citation omitted). "The existence of a conspiracy may be established by direct or circumstantial evidence, although it is generally established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the

> existence of a conspiracy." *State v. Worthington*, 84 N.C. App. 150, 162, 352 S.E.2d 695, 703 (1987) (internal quotation marks and citations omitted). "In 'borderline' or close cases, our courts have consistently expressed a preference for submitting issues to the jury, both in reliance on the common sense and fairness of the twelve and to avoid unnecessary appeals." *State v. Hamilton*, 77 N.C. App. 506, 512, 335 S.E.2d 506, 510 (1985) (citations omitted).

*Glisson*, 251 N.C. App. at 848, 796 S.E.2d at 128 (addressing the sufficiency of evidence to support a conviction for felonious conspiracy to traffic opium).

¶ 23 Here, as in *Glisson*, "the State presented evidence of indefinite acts amounting to substantial evidence that Defendant conspired with" the other participants of this deal to traffic methamphetamine. *Id.* The State's evidence showed Defendant and Reyes, a middleman, were texting each other the morning of the methamphetamine deal and these texts refer to the delivery being delayed in Alabama. Defendant then met Reyes and the driver at the La Fiesta in Greensboro before travelling together to the public storage facility. At the public storage facility, Defendant attempted to take part in dropping off the methamphetamine but was unable to do so because he was locked in the back seat. Defendant continued to travel with Reyes to a nearby gas station where he transferred to another vehicle in which he rode together with the informant, Reyes, and Paco to a nearby restaurant to wait for the money to arrive. Defendant ultimately returned to the storage unit with the group before being apprehended by the police.

¶ 24    Defendant argues his "presence alone does not support a conspiracy," and the text messages are too "unrelated to this deal" to evidence an agreement between him and any other participant in the methamphetamine deal.   "[T]he trial court is required to view the evidence in the light most favorable to the State, making all reasonable inferences from the evidence in favor of the State."   *Shelman*, 159 N.C. App. at 305, 584 S.E.2d at 92 (quoting *Kemmerlin*, 356 N.C. at 473, 573 S.E.2d at 889).   Each of these acts "might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy."   *Glisson*, 251 N.C. App. at 848, 796 S.E.2d at 128 (quoting *Worthington*, 84 N.C. App. at 162, 352 S.E.2d at 703).   The State presented sufficient "relevant evidence that a reasonable mind might accept as adequate to support [the] conclusion" that the drug deal participants, including Defendant, had "a mutual, implied understanding" to traffic the methamphetamine. *Shelman*, 159 N.C. App. at 304, 584 S.E.2d at 92 (first quote); *Glisson*, 251 N.C. App. at 848, 796 S.E.2d at 128 (second quote).   The State's evidence "[gave] rise to a reasonable inference of guilt" and was "properly submitted to the jury[.]" *Shelman*, 159 N.C. App. at 305, 584 S.E.2d at 92 (second alteration in original) (quotation omitted).

¶ 25    The State presented substantial evidence to show Defendant was part of a criminal conspiracy to traffic methamphetamine.   The trial court did not err in denying Defendant's motion to dismiss.

**B. Speedy Trial Motions**

¶ 26      Defendant argues both his federal and state constitutional rights to a speedy trial were violated. He argues "the trial court committed constitutional error in failing to dismiss" his case based upon each of his four speedy trial motions. (Capitalization altered). The State argues no speedy trial violation occurred and proposes a novel rule for measuring the time periods of delays to determine whether a violation has occurred.

> We review an alleged violation of a defendant's Sixth Amendment right to a speedy trial de novo. *State v. Wilkerson*, 257 N.C. App. 927, 929, 810 S.E.2d 389, 391 (2018). In reviewing the denial of a motion to dismiss for a speedy-trial violation, "[w]e review the superior court's order to determine whether the trial judge's underlying findings of fact are supported by competent evidence and whether those factual findings in turn support the judge's ultimate conclusions of law." *Id.* (citation and internal quotation marks omitted). In reviewing the conclusions of law, we "consider the matter anew and substitute our judgment for that of the trial court." *State v. Johnson*, 251 N.C. App. 260, 265, 795 S.E.2d 126, 131 (2016) (citation omitted).

*State v. Spinks*, 277 N.C. App. 554, 561, 2021-NCCOA-218, ¶ 20. "Competent evidence is evidence that a reasonable mind might accept as adequate to support the finding[s]." *State v. Newborn*, 279 N.C. App. 42, 49, 2021-NCCOA-426, ¶ 24 (quotation omitted).

¶ 27      The timeline for this case is complex, with several distinct periods of time for

consideration based upon Defendant's arrest, his speedy trial motions, the two declared mistrials, and the ultimate trial in which Defendant was convicted. The State's arguments rely on these separate time periods. The dates of note for purposes of this analysis are as follows:

- **7 February 2016:** Defendant was arrested in connection with the methamphetamine deal. He was later indicted on 2 May 2016.

- **6 July 2017:** The trial court held Defendant's first "status hearing." Defendant rejected the State's first plea offer and asserted his right to a jury trial at this hearing.

- **13 November 2017:** The trial court held Defendant's second "status hearing." Defendant rejected a second plea offer and reasserted his right to a jury trial at this hearing.

- **30 January 2018:** Defendant was represented by counsel but filed a *pro se* motion asserting his right to a speedy trial.

- **12 February 2018:** Defendant filed his first speedy trial motion through counsel asserting violations of his right to a speedy trial under both our state and federal Constitutions. This motion was heard before the trial court 6 March 2018. The trial court entered an order without findings of fact on or about the same day denying Defendant's motion.

- **3 April 2018 through 6 April 2018:** On 3 April 2018 Defendant's counsel filed another written motion "renew[ing] and maintain[ing]" his first speedy trial motion. Our record and transcripts do not show if or when the renewed motion was heard by the trial court. Defendant's first trial was held. Defendant's first trial ended in a mistrial on 6 April 2018 due to a hung jury. The trial court entered an order 27 April 2018 declaring the mistrial.

- **October 2018:** Defendant, again acting *pro se*, sent an undated letter to the court and reasserted his right to a speedy trial. The court responded 31 October 2018 and informed Defendant as to the proper procedure for filing motions.

- **Approximately 23 April 2019:**[3] Defendant filed his second speedy trial motion through counsel. This motion was heard 6 May 2019. The court then entered a written order denying the motion without findings on 7 May 2019.

- **7 August 2019:** Defendant filed a third speedy trial motion through counsel. The trial court denied the third motion by an order entered 23 August 2019. This order included findings of fact.

- **19 August 2019 through 26 August 2019:** Defendant's second trial started on 19 August 2019 and ended in a mistrial due to a hung jury on 26 August 2019. The court entered an order the same day declaring the mistrial.

- **March 2020 through Fall 2020:** The Covid-19 pandemic shut down many court proceedings, including jury trials, and caused significant delays in trial court proceedings.[4]

- **8 January 2021:** Defendant filed his fourth and final speedy trial motion through counsel. This motion was denied by a written order entered 16 February 2021. The order did not include findings of fact.

- **24 May 2021:** Defendant's third and final trial begins.

- **28 May 2021:** Defendant was convicted during his third jury trial and a judgment was entered as addressed above.

¶ 28      The parties agree on the framework for a speedy trial analysis and the

---

[3] The file stamp on Defendant's second speedy trial motion is illegible.

[4] The Chief Justice of the Supreme Court of North Carolina first issued emergency directives postponing proceedings and limiting district and superior court proceedings to remote proceedings on 13 March 2020. Order of the Chief Justice Emergency Directives 1 to 2 (13 March 2020). Proceedings were repeatedly postponed through 2020. *See, e.g.*, Order of the Chief Justice Emergency Directives 1 to 7 Postponing Court Proceedings until June 1 (2 April 2020); Order of the Chief Justice Emergency Directives 9 to 16 (21 May 2020); Order of the Chief Justice Extending Emergency Directives 9-15, 20-22 (15 August 2020). Several of the emergency directives were extended well into 2021. *See, e.g.*, Order of the Chief Justice Extending Emergency Directives 3, 5 (4 June 2021).

standard of review but dispute how to weigh the factors in the analysis.

> [T]he United States Supreme Court identified four factors "which courts should assess in determining whether a particular defendant has been deprived of his right" to a speedy trial under the federal Constitution. These factors are: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) whether the defendant has suffered prejudice as a result of the delay.

*State v. Flowers*, 347 N.C. 1, 27, 489 S.E.2d 391, 406 (1997) (quoting *Barker v. Wingo*, 407 U.S. 514, 530, 33 L. Ed. 2d 101, 117 (1972)). Our appellate courts follow the Supreme Court of the United States's analysis in *Barker v. Wingo* when reviewing speedy trial claims under both our state and federal Constitutions. *See id.* (citing *State v. Webster*, 337 N.C. 674, 678, 447 S.E.2d 349, 351 (1994) ("We follow the same analysis when reviewing such claims under Article I, Section 18 of the North Carolina Constitution.")).

> The right to a speedy trial is different from other constitutional rights in that, among other things, deprivation of a speedy trial does not *per se* prejudice the ability of the accused to defend himself; it is impossible to determine precisely when the right has been denied; it cannot be said precisely how long a delay is too long; there is no fixed point when the accused is put to a choice of either exercising or waiving his right to a speedy trial; and dismissal of the charges is the only possible remedy for denial of the right to a speedy trial.

*State v. McKoy*, 294 N.C. 134, 140, 240 S.E.2d 383, 388 (1978) (citing *Barker*, 407 U.S. 514, 33 L. Ed. 2d 101).

> No single factor is regarded as either a necessary or
> sufficient condition to the finding of a deprivation of the
> right to a speedy trial. "Rather, they are related factors and
> must be considered together with such other circumstances
> as may be relevant. In sum, these factors have no
> talismanic qualities; courts must still engage in a difficult
> and sensitive balancing process. But, because we are
> dealing with a fundamental right of the accused, this
> process must be carried out with full recognition that the
> accused's interest in a speedy trial is specifically affirmed
> in [both] Constitution[s]."

*Id.* (quoting *Barker*, 407 U.S. 514, 33 L. Ed. 2d 101).

Here, Defendant filed two *pro se* motions and four motions through counsel to dismiss based upon a violation of his right to a speedy trial. The first two orders denied his first and second motions without findings of fact, the third order denied his third motion with findings of fact, and the fourth order denied his fourth motion without findings of fact. Defendant argues "[t]he failure of the trial courts in both the first and second speedy trial hearings to make any findings or conduct any analysis would normally require remand." But Defendant also argues no remand is needed because "the State has already had ample opportunity to explain the delays at multiple hearings . . . [and] asks this Court to find his right to [a] speedy trial was violated without resorting to remand." The State argues remand is unnecessary because we "review[] speedy trial motions *de novo*, substituting [our] judgment for the trial court[,]" and all four *Barker* factors "clearly favor the State."

### 1. *Appellate Review*

¶ 30        Because three of the four orders denying Defendant's motions were made without findings of fact, we first must determine whether we may review all four of Defendant's motions or if we are required to remand for additional findings. *See State v. Sheridan*, 263 N.C. App. 697, 705, 824 S.E.2d 146, 152 (2019) (remanding for "a proper *Barker v. Wingo* analysis and appropriate findings" where the "record on appeal [was] insufficiently developed" for review by this Court); *State v. Wilkerson*, 257 N.C. App. 927, 937, 810 S.E.2d 389, 396 (2018) ("A full evidentiary hearing is required in order for the superior court to hear and make an appropriate assessment of Defendant's arguments."); *State v. Howell*, 211 N.C. App. 613, 711 S.E.2d 445 (2011) (remanding because the trial court "reached its Sixth Amendment ruling under a misapprehension of the law and without conducting a complete analysis, including consideration of all the relevant facts and law in [the] case").

¶ 31        Trial courts are not always required to enter written findings when analyzing speedy trial motions:

> In ruling on a motion for a speedy trial the trial court is not always required to conduct an evidentiary hearing and make findings of facts and conclusions of law. *See State v. Dietz,* 289 N.C. 488, 495, 223 S.E.2d 357, 362 (1976). In those instances, however, when the motion to dismiss for denial of a speedy trial is based on allegations not "conjectural and conclusory [in] nature," an evidentiary hearing is required and the trial court must enter findings to resolve any factual disputes and make conclusions in support of its order. *Id.* When there is no objection, evidence at the hearing may consist of oral statements by

> the attorneys in open court in support and in opposition to
> the motion to dismiss. *See State v. Pippin,* 72 N.C. App.
> 387, 397–98, 324 S.E.2d 900, 907 (findings properly based
> on oral arguments of attorney where opposing party did not
> object to procedure), *disc. rev. denied,* 313 N.C. 609, 330
> S.E.2d 615 (1985).

*State v. Chaplin*, 122 N.C. App. 659, 663, 471 S.E.2d 653, 656 (1996).

¶ 32          Here, Defendant only challenges the lack of findings in the orders from the first speedy trial hearing on 6 March 2018 and second speedy trial hearing on 6 May 2019. He challenges findings and conclusions in the trial court's written order addressing his third speedy trial motion, and he simply describes the trial court's 16 February 2021 order denying his fourth motion.

### a. First Speedy Trial Motion

¶ 33          Defendant's first motion was filed on 30 January 2018. Although he was represented by counsel, he filed a handwritten, *pro se* motion asserting his right to a speedy trial. He filed his first speedy trial motion by counsel on 12 February 2018, which was appropriately filed and served upon the State. The trial court heard the motion filed by counsel on 6 March 2018 and entered an order denying the motion on or about the same day. We first note that a defendant is not permitted to proceed both *pro se* and by counsel, so defendant's initial *pro se* motion was subject to dismissal for this reason alone. But even if we consider the initial *pro se* motion as a properly filed motion, these motions simply recount the fact that Defendant had been

arrested, was incarcerated, and "his lengthy pretrial confinement is oppressive and prejudicial in that he has been deprived of his freedom for approximately two years without trial." In his first motion filed by counsel, Defendant then quotes *State v. Johnson*, 3 N.C. App. 420 (1969), and *State v. Chaplin*, 122 N.C. App. 659 (1996), yet fails to articulate why these cases apply to the circumstances surrounding his incarceration at the time either motion was made. He fails to allege "factual allegations necessary to support his contentions of unnecessary and deliberate delay on the part of the prosecution, or of actual prejudice[,]" *State v. Goldman*, 311 N.C. 338, 346, 317 S.E.2d 361, 366 (1984), and his motion is "conjectural and conclusory [in] nature[.]" *Chaplin*, 122 N.C. App. at 663, 471 S.E.2d at 656. Thus, the trial court did not err by denying the first speedy trial motions without making findings of fact.

¶ 34        Defendant then renewed his first speedy trial motion filed through counsel by another written motion filed the first day of his first trial, 3 April 2018. The record is unclear if, when, and how this motion was denied. Defendant's trial proceeded and ended in a mistrial due to a hung jury 6 April 2018. The trial court entered an order 27 April 2018 declaring the mistrial.

### b. *Second Speedy Trial Motion*

¶ 35        After his first mistrial, in October 2018 Defendant sent an undated letter addressed to Judge Lindsay Davis Jr. to the Guildford County Courthouse and reasserted his right to a speedy trial. The court responded 31 October 2018 by letter

informing Defendant that the addressee of his letter, Judge Davis, had retired and that "[f]uture communications with the Court must be in the form of motions or other appropriate pleadings filed with the Clerk of Court and served on the District Attorney." The court also informed Defendant, "[i]t is inappropriate to write ex parte letters to any individual presiding judge. No judge is allowed to speak with you about your case except in open court." The letter also gave Defendant information on how to dismiss his court-appointed attorney and information on how to file a motion.

¶ 36          Defendant then filed his second speedy trial motion through counsel on or about 23 April 2019. This motion again asserted his right to a speedy trial, quoted *Johnson* and *Chaplin*, and failed to allege "factual allegations necessary to support his contentions of unnecessary and deliberate delay on the part of the prosecution, or of actual prejudice." *Goldman*, 311 N.C. at 346, 317 S.E.2d at 366. Defendant's motion simply stated he had been arrested and imprisoned, that he had filed speedy trial motions, that he had been tried, and that he continued to maintain his innocence. He again quoted *Johnson* and *Chaplin*, asserted his "lengthy pretrial confinement is oppressive and prejudicial in that he has been deprived of his freedom for three years and two months without resolution[,]" but failed to allege any deliberate delay by the prosecution or actual prejudice as required by *Johnson* or *Chaplin*.

¶ 37          The trial court held an evidentiary hearing and then entered an order on 7 May

2019 denying Defendant's motion "without prejudice at this time." This order did not include findings of fact, but it stated that "the Defense may refile the Motion after August 15, 2019." The trial court also continued trial to 22 July 2019.

¶ 38        Upon a review of the record, disregarding Defendant's *pro se* motions, we find Defendant's second speedy trial motion filed by counsel was "conjectural and conclusory [in] nature," and the trial court was not required to make findings of fact. *Chaplin*, 122 N.C. App. at 663, 471 S.E.2d at 656 (quoting *Dietz*, 289 N.C. at 495, 223 S.E.2d at 362); *Goldman*, 311 N.C. at 346, 317 S.E.2d at 366. The motions filed by counsel recounted a simple history of Defendant's arrest and imprisonment, made a bare assertion of his right to a speedy trial, and lacked factual allegations sufficient to show a violation of his speedy trial right. Even so, for each motion the trial court held evidentiary hearings and Defendant received the opportunity to present arguments and provide evidence in the form of oral statements by his attorney. We find no error by the trial court in failing to enter findings of fact and conclusions of law as to the first and second speedy trial motions.

        c.        *Third Speedy Trial Motion*

¶ 39        After hearing Defendant's third speedy trial motion, the trial court entered an order with findings of fact and conclusions of law. The initial four findings addressed the dates of Defendant's arrest and the charges against him, as addressed above. The trial court then found and concluded:

4. Defendant was one of four co-defendants.

5. Up through May, 2017, the state was preparing for the trial of one of the co-defendants, which included a lengthy process by the North Carolina Administrative Office of the Courts of transcribing recorded contact between certain of the co-defendants and an informant, with the process of transcription taking, as it was described to the State at the hearing on this motion, taking up to one hour for every minute of the recording transcribed.

6. The co-defendant's case came on for trial on May 8, 2017, and the co-defendant pled guilty during the trial.

7. The Defendant rejected a plea offer on or about July 6, 2017, and the State began efforts to schedule a trial, which required coordination of witnesses from numerous jurisdictions and several law enforcement agencies. These witnesses included a witness from the Drug Enforcement Administration and an expert witness from the DEA forensic lab in Miami, Florida.

8. Defendant was presented with a second plea offer, which he rejected on or about November 13, 2017.

9. Defendant filed his first speedy trial motion on February 12, 2018.

10. Defendant's trial commenced on April 3, 2018, and ended in a mistrial on April 6, 2018.

11. Transcripts of the trial proceedings were requested, and, through no delay attributable to the District [A]ttorney's [O]ffice, these transcripts took eight months to prepare, and were obtained at the end of 2018.

12. Defendant filed his second speedy trial motion on or about April 23, 2019, which was heard and denied, without prejudice to refile at a later time, by the Honorable William Wood.

13. During the intervening time period, the State was awaiting the resolution of a motion for appropriate relief filed in a co-defendant's matter, to determine whether a trial proceeding against defendant should be joined with those matters in the event the motion for appropriate relief was granted.

14. The State is now indicating that it is ready to proceed with trial during this session of Court.

15. The delays in these matters being reached for trial are not purposeful or oppressive, are not owing to any neglect of the District Attorney, and are not intended to hamper the defense or gain a tactical advantage in these matters.

The trial court then made conclusions of law, addressing each of the *Barker* factors, and denied Defendant's motion.

¶ 40        "In reviewing the denial of a motion to dismiss for a speedy-trial violation, '[w]e review the superior court's order to determine whether the trial judge's underlying findings of fact are supported by competent evidence and whether those factual findings in turn support the judge's ultimate conclusions of law.'" *Spinks*, ¶ 20 (quoting *Wilkerson*, 257 N.C. App. at 929, 810 S.E.2d at 391). "Competent evidence is evidence that a reasonable mind might accept as adequate to support the finding[s]." *Newborn*, ¶ 24. Competent evidence for purposes of a speedy trial motion "may consist of oral statements by the attorneys in open court in support and in

opposition to the motion to dismiss." *Chaplin*, 122 N.C. App. at 663, 471 S.E.2d at 656 (citing *Pippin*, 72 N.C. App. at 397–98, 324 S.E.2d at 907 (summarizing discussion from *Pippin* as "findings properly based on oral arguments of attorney where opposing party did not object to procedure")).

¶ 41      Although Defendant's brief states he challenges some of the trial court's findings of fact as unsupported by the evidence, his entire argument challenging the findings is that Findings 5 through 7 are "partially unsupported and incomplete;" Finding 11 is "unsupported and inapposite;" Finding 13 is "incorrect and based on misstatements of the prosecutor;" and Finding 15 is "unsupported and incorrect." Defendant does not address *how* the trial court's findings were incomplete, unsupported, or incorrect. Since he has made no substantive argument regarding these findings, he has waived any challenge to these findings and we will consider them as binding on appeal. N.C. R. App. P. 28(b)(6) ("An appellant's brief shall contain . . . An argument, to contain the contentions of the appellant with respect to each issue presented. Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned.") *See Yeun-Hee Juhnn v. Do-Bum Juhnn*, 242 N.C. App. 58, 62-63, 775 S.E.2d 310, 313-14 (2015) ("However, defendant fails to set forth any specific challenges to the findings of fact and instead presents a broad argument which merely contends that 'the evidence at trial [did] not support a finding that [defendant] acted in bad faith, warranting the imputation of

income to [defendant.]' It is well established by this Court that where a trial court's findings of fact are not challenged on appeal, they are deemed to be supported by competent evidence and are binding on appeal. . . . As defendant has failed to articulate challenges to these specific findings of fact, we find these findings to be not only binding on appeal, but also supported by competent evidence demonstrating that defendant did indeed act in bad faith regarding his income." (internal citation omitted)).

¶ 42        Defendant also contends that the trial court's conclusions of law do not properly address the *Barker* factors and the trial court erred by denying his motion. We will discuss the trial court's conclusions of law in our *de novo* review of the trial court's order ruling on the third speedy trial motion below.

### d. Fourth Speedy Trial Motion

¶ 43        As discussed above, the trial court had entered an order addressing Defendant's third speedy trial motion in August 2019; Defendant filed his fourth motion on 8 January 2021. This motion recites the history of the case, including the prior motions to dismiss and the trial court's rulings upon those motions, and alleges that "a transcript of the witness testimony from the second trial [in August 2019] has been ordered by Judge Stuart Albright." This motion alleged additional delay since the mistrial in August 2019; that his motion to unsecure his bond "so that he may begin his federal sentence while the third trial is pending" was denied in October

2019; and repeated general allegations of prejudice and anxiety from the continued pretrial confinement. We also note Defendant did *not* make any allegations as to any delay in 2020 based upon the suspension of some trial court proceedings, including jury trials, due to the emergency directives from the Covid-19 pandemic.

¶ 44    The trial court held a hearing on 16 February 2021 and entered an order denying Defendant's fourth motion without making findings of fact. In his brief Defendant simply notes "[t]here were no written findings[,]" before again arguing the *Barker* factors cut in his favor. Additionally, there were no disputed facts at the fourth speedy trial hearing and the court did not need to "resolve any factual disputes and make conclusions in support of its order." *Chaplin*, 122 N.C. App. at 663, 471 S.E.2d at 656. At the hearing, Defendant's counsel introduced his motion and the *Barker* analysis, then State's counsel recounted the procedural history of this case and the cases of the co-defendants. Defendant did not object to the procedure used by the trial court, nor did he argue that the State's proffered reasons for delay were incorrect or false. Even when the prosecutor stated, as to State's preferential order of prosecuting the four co-defendants, that "[Defendant's Counsel] and his client, [Defendant,] certainly tacitly consented to the approach on the State's part[,]" Defense counsel did not object. The trial court did not err in failing to enter findings of fact or conclusions of law as to Defendant's fourth motion.

¶ 45    Because the trial court did not err by holding four hearings to consider

Defendant's motions, or by failing to make written findings after the first, second, and fourth hearings, we find no error as to the procedures used by the trial court to hear Defendant's speedy trial motions. Findings were not required in the first, second, and fourth orders, and the order entered upon the third motion adequately addressed any disputed facts. We will now address Defendant's challenges to the trial court's conclusions of law in the order entered after hearing of the third speedy trial motion as well as the trial court's denial of Defendant's fourth and last speedy trial motion.

### 2. *Substantive Review of Denial of Defendant's Speedy Trial Motions*

¶ 46        Because Defendant's motions were "conjectural and conclusory [in] nature," and because "[t]he information before the trial court is not in dispute" as to the first, second, and fourth hearings, "the failure of the trial court to making findings of fact does not prevent review by this Court" and we now turn to the *Barker* factors. *Chaplin*, 122 N.C. App. at 663-64, 471 S.E.2d at 656 (citing *Harris v. North Carolina Farm Bureau Mut. Ins. Co.*, 91 N.C. App. 147, 150, 370 S.E.2d 700, 702 (1988)); *Harris*, 91 N.C. App. at 150, 370 S.E.2d at 702 ("[R]emand to the trial court is not necessary if the facts are not in dispute and if only one inference can be drawn from the undisputed facts."). Defendant argues throughout his brief that all four *Barker* factors weighed in his favor at the time each motion was made, and these factors weighed progressively more heavily in his favor as time passed.

*a. Length of the Delay*

¶ 47 "The United States Supreme Court has found post-accusation delay 'presumptively prejudicial' as it approaches one year." *Flowers*, 347 N.C. at 27, 489 S.E.2d at 406 (quoting *Doggett v. United States*, 505 U.S. 647, 652 n. 1, 120 L. Ed. 2d 520, 528 n. 1 (1992)). "However, presumptive prejudice 'does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry.'" *Id.*; *Barker*, 407 U.S. at 530, 33 L. Ed. 2d 117 ("The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.").

¶ 48 In the trial court's order denying Defendant's third motion, the conclusions of law begin by noting the *Barker* factors. The trial court did not make a specific conclusion of law as to the first factor, the length of the delay, but clearly the trial court concluded that the length of the delay was sufficient to trigger the *Barker* inquiry, as the trial court made findings of fact and conclusions of law specifically addressing the second, third, and fourth *Barker* factors.

¶ 49 In most cases, the length of the delay is the most straightforward factor and it is generally not in dispute. Here, the situation is different because of the various motions and the two trials ending in mistrial. The parties' interpretations of our case law diverge as to how we should consider the length of the delay. Defendant contends

the clock continues to run from his initial arrest until his final trial; the State contends the speedy trial clock should "reset" upon each mistrial. The State argues the protection afforded a criminal defendant by his right to a speedy trial "is for a speedy *trial* not a speedy *adjudication*." (Emphasis in original.) In the State's interpretation of this factor, the lengths of delay are then: (1) 24 months between Defendant's arrest in February 2016 and his first speedy trial motion in February 2018; (2) 12 months between Defendant's first mistrial in April 2018 and his second speedy trial motion in April 2019; (3) 16 months between Defendant's first mistrial in April 2018 and third speedy trial motion in August 2019; and (4) 17 months between his second mistrial in August 2019 and final speedy trial motion in January 2021.

¶ 50    In response to State's proposed "reset upon mistrial" rule Defendant "contends the most fair approach is to calculate the length of delay from arrest to final judgment, and to consider mistrials or other similar interruptions under the 'reason for delay' factor." He argues such an approach "prevents the absurd result of a person being retried to mistrial every eleven months, never reaching a final verdict, and never qualifying for a presumptive speedy trial violation." He also argues, "[e]ven using the State's approach . . . the time period before each of the three trials was presumptively prejudicial[.]" Under Defendant's interpretation of this factor, the total delay from his arrest in February 2016 until the final adjudication of his case in

May 2021 was 63 months (five years, three months), during which he filed four speedy trial motions and his first two trials were declared mistrials.

### b. *State v. Carvalho*

¶ 51 Both parties cite our decision in *State v. Carvalho*. 243 N.C. App. 394, 777 S.E.2d 78 (2015) *cert. denied sub nom. Carvalho v. North Carolina*, — U.S. —, 199 L. Ed. 2d 19 (2017). Defendant argues that "[a] mistrial does not reset the speedy trial clock."[5] The State argues "the Carvalho [C]ourt's implicit decision to not reset the timer upon both mistrials was, at most, dicta, and does not preclude this Court from fully addressing the issue now." (Original emphasis.)

¶ 52 The facts of the underlying offenses in *Carvalho* are not pertinent to this appeal, but the procedural history of that case is. In *Carvalho*, the defendant was arrested on 16 November 2004 and indicted for two separate murders on 3 January 2005. *Carvalho*, 243 N.C. App. at 395, 777 S.E.2d at 80-81. The defendant was tried for the second of these murders in 2009, and the trial court declared a mistrial due to a deadlocked jury. *Id.* at 395, 777 S.E.2d at 81. The defendant was retried in 2010 and a second mistrial was declared due to a deadlocked jury. *Id.* The defendant then

---

[5] At this point, it is important to note that Defendant introduces this *Carvalho*-based argument in a footnote. The State argues Defendant's argument should therefore be considered abandoned pursuant to Rule 28. Because Defendant addressed *Carvalho* both in this footnote in his primary brief and again at oral argument, and because we find *Carvalho* useful to our discussion regarding the case at bar and to State's proposed rule regarding the resetting of "the speedy trial clock," we will address Defendant's argument.

"filed a motion to dismiss the charges based upon a speedy trial violation on 3 December 2012 . . . ." *Id.* at 397, 777 S.E.2d at 82. Similar to the case at bar, "Defendant asserted he was denied his constitutional right to a speedy trial due to the overall length of his imprisonment, as well as a lack of evidence sufficient to obtain a conviction due to [a State witness]'s unwillingness to testify." *Id.* "On 6 June 2013, the trial court held a hearing on Defendant's motion to dismiss and entered an order denying Defendant's motion on 2 January 2014." *Id.* at 398, 777 S.E.2d at 82.

The defendant was then tried for the first of the two murders and robbery with a firearm on 7 October 2013. *Id.* at 399, 777 S.E.2d at 83. "The trial court declared a mistrial after the jury deadlocked. Six months later, Defendant was tried a second time for the murder . . . and robbery with a firearm on 1 April 2014." *Id.* "Defendant moved to dismiss the charges at the close of the State's evidence, and again at the close of all of the evidence. The trial court denied Defendant's motions." *Id.* The defendant was ultimately found guilty of both offenses 7 April 2014. *Id.* "[A]lmost nine years elapsed between the time the State indicted Defendant in 2004 and the time of the June 2013 hearing on his motion to dismiss [based upon a speedy trial violation.]" *Id.* at 401, 777 S.E.2d at 84.

The State asserts the Court in *Carvalho* did not discuss in great detail how the issue of this nine-year delay impacts the *Barker* analysis. In *Carvalho,* this Court noted the one-year "presumptively prejudicial" rule as to post-accusation delay and

then determined the nine-year "delay clearly passes the demarcation into presumptively prejudicial territory and triggers the *Barker* analysis." *Id.* at 401, 777 S.E.2d at 84 (citing *Flowers*, 347 N.C. at 27, 489 S.E.2d at 406). The Court then immediately concluded its analysis of this factor with: "The almost nine-year delay . . . 'is not *per se* determinative of whether a speedy trial violation has occurred,' and requires careful analysis of the remaining factors." *Id.* (quoting *Webster*, 337 N.C. at 678-79, 447 S.E.2d at 351). As argued by the State, "the Carvalho [C]ourt's implicit decision to not reset the timer upon both mistrials . . . does not preclude this Court from fully addressing the issue now." (Original emphasis.)

¶ 55         Additionally, the 9-year timeline in *Carvalho* as to speedy trial motions and mistrials is distinguishable from the timeline in the present case. In the present case, Defendant was arrested on 7 February 2016 and filed a speedy trial motion 24 months later. Defendant renewed this motion on 3 April 2018 and the first mistrial was declared on 27 April 2018 after a jury deadlock. After the first mistrial Defendant filed two more speedy trial motions; his second motion was filed on or about 23 April 2019, his third motion on 7 August 2019. Then, Defendant's second trial ended in a mistrial because "the jury is hopelessly deadlocked . . . ." Defendant's fourth and final "Motion to Dismiss for Violation of Speedy Trial Right" was filed 8 January 2021 before he was ultimately convicted in his third jury trial and a judgment was entered 28 May 2021. (Capitalization altered.)

¶ 56     In *Carvalho*, the defendant did not file his "motion to dismiss the charges based upon a speedy trial violation [until] 3 December 2012[.]" *Id.* at 397, 777 S.E.2d at 82. The defendant did not file his motion to dismiss until *after* both mistrials were declared as to the second murder, and before his trial for the first murder and robbery had even began. *See id.* at 395-99, 777 S.E.2d at 81-83. The defendant did not assert his right until 2012, over eight years after his initial arrest in connection with the first murder and over two years after the two mistrials in connection with the second murder. *See id.* at 402-403, 777 S.E.2d at 85. Defendant notes the Court in *Carvalho* "count[ed the] full nine-year interval between indictment and final trial, which included two mistrials, when analyzing [the] speedy trial claim." But Defendant does not note, as discussed above, that most of this delay was due to the fact the defendant waited years to assert his right to a speedy trial.

¶ 57     Whether we use the State's "reset" rule or not, the delay was sufficient to trigger a speedy trial inquiry. As Defendant noted, and as in *Carvalho*, "the time period before each of the three trials was presumptively prejudicial[.]" We decline to adopt State's proposed "reset" rule. Whether we consider the delay as 12, 16, 17, 24, or even 63 months, the "post-accusation delay [is] 'presumptively prejudicial'" because each of these time periods is at least one year. *See Carvalho*, 243 N.C. App. at 401, 777 S.E.2d at 84 (citing *Doggett*, 505 U.S. at 652 n. 1, 120 L. Ed. 2d at 528 n. 1).

¶ 58        As discussed below, the reasons for each delay are more significant than merely the fact that a mistrial occurred, so we will consider the substance of the State's contentions under the second *Barker* factor. Regardless of whether we follow the State's or Defendant's approach to measuring time for the purpose of a *Barker* analysis, the analysis was triggered, and the prejudicial effect of the delay(s) is addressed in more detail below. *See id.* at 400-401, 777 S.E.2d at 84.

> c. *Reason for the Delay*

¶ 59        The trial court concluded "As to the second Barker factor, the reasons for the passage of time in this case between indictment and trial is not due to any negligence or willfulness of the State. The defendant does not allege in his motion nor provide any evidence of any willfulness or intentional delay by the State."

¶ 60        The trial court's conclusion as to the reasons for the delay is supported by the evidence and findings of fact. On *de novo* review, we agree the second *Barker* factor does not particularly favor either party. At best, it slightly favors the defendant, but there was also no showing of any deliberate delay by the State.

> Generally, the defendant "bears the burden of showing the delay was the result of *neglect* or *willfulness* of the prosecution." *Wilkerson*, 257 N.C. App. at 930, 810 S.E.2d at 392 (citation and internal quotation marks omitted). However, a "particularly lengthy" delay "creates a prima facie showing that the delay was caused by the negligence of the prosecutor." *State v. Strickland*, 153 N.C. App. 581, 586, 570 S.E.2d 898, 902 (2002), *cert. denied*, 357 N.C. 65, 578 S.E.2d 594 (2003).

*Spinks*, ¶ 26 (emphasis in original). "Upon a prima facie showing of prosecutorial neglect by a lengthy delay, 'the burden shifts to the State to rebut and offer explanations for the delay.'" *Id.* ¶ 27 (quoting *Wilkerson*, 257 N.C. App. at 930, 810 S.E.2d at 392). "Once the State offers a valid reason 'for the lengthy delay of [the] defendant's trial, the burden of proof shifts back to the defendant to show neglect or willfulness by the prosecutor.'" *Id.* (alteration in original) (quoting *Strickland*, 153 N.C. App. at 586, 570 S.E.2d at 902). "The State is allowed good-faith delays which are reasonably necessary for the State to prepare and present its case, but is proscribed from purposeful or oppressive delays and those which the prosecution could have avoided by reasonable effort." *Id.* ¶ 28 (quoting *Wilkerson*, 257 N.C. App. at 930-31, 810 S.E.2d at 393).

¶ 61        Defendant argues that this factor cuts in his favor at the time he made each motion. As addressed above, if we take Defendant's measure of 63 months for a speedy trial delay then Defendant undoubtably shows a "particularly lengthy delay." *Id.* ¶ 26. Even taking the more State-friendly measurement of 24 months between arrest and Defendant's first speedy trial motion we find a "prima facie showing that the delay was caused by the negligence of the prosecutor." *Id.* ¶ 26 (quoting *Strickland*, 153 N.C. App. at 583, 570 S.E.2d at 902). The State does not make arguments specifically rebutting whether the initial delay "create[d] a prima facie showing that the delay was caused by the negligence of the prosecutor[,]" *id.*, and

instead cites *State v. Spivey*, 357 N.C. 114, 119, 579 S.E.2d 251, 255 (2003), to argue "[o]nly after the defendant has carried [t]his burden of proof . . . must the State offer evidence fully explaining the reasons for the delay and sufficient to rebut the *prima facie* evidence." The trial court's uncontested findings of fact address the reasons for each delay, and none indicated negligence or willful delay by the State.

¶ 62 The trial court's findings establish Defendant was arrested and charged on 7 February 2016 and was later indicted on 2 May 2016. "Defendant was one of four co-defendants[,]" and through May 2017 "the state was preparing for the trial of one of the co-defendants, which included a lengthy process . . . of transcribing recorded contact between certain of the co-defendants and an informant," and this transcription took approximately "one hour for every minute of the recording transcribed." On 8 May 2017 the co-defendant pled guilty during his trial, and on 6 July 2017 Defendant rejected his first plea offer. The State began scheduling Defendant's trial, "which required coordination of witnesses from numerous jurisdictions and several law enforcement agencies . . . includ[ing] a witness from the Drug Enforcement Administration and an expert witness from the DEA forensic lab in Miami, Florida." Defendant rejected a second plea offer around 13 November 2017, then filed his first speedy trial motion on 12 February 2018.

¶ 63 "Neither a defendant nor the State can be protected from prejudice which is an incident of ordinary or reasonably necessary delay[,]" *State v. Armistead*, 256 N.C.

App. 233, 239, 807 S.E.2d 664, 669 (2017) (quoting *Johnson*, 275 N.C. at 273, 167 S.E.2d at 280), and Defendant waited 24 months after his arrest before filing his speedy trial motion. Some amount of this delay was "incident of ordinary" trial preparation, because it simply takes time for a case to progress from indictment to trial. As the State notes, and as the trial court's unchallenged findings of fact in its third order establish, Defendant's charges arose out of a complex investigation involving several law enforcement agencies which resulted in prosecution of several defendants. Defendant was also offered two plea deals, and over half of the delay was caused by the prosecution of the co-defendant and the transcription of recorded contact between the participants of the drug deal.

¶ 64       While the 24-month period between Defendant's arrest and first motion may be "presumptively prejudicial," the State made a sufficient showing to rebut the Defendant's initial showing. The burden then shifted back to Defendant "to *show* neglect or willfulness by the prosecutor." *Strickland*, 153 N.C. App. at 586, 570 S.E.2d at 902-03 (emphasis added). As to the delay between Defendant's arrest and first speedy trial motion, he has failed to make this showing.[6] *Spinks*, ¶ 26 (quoting

---

[6] Defendant also argues that prosecutorial preference in the order in which coconspirators are tried is not a legitimate and valid reason for the delay between his arrest and trial and fault can be attributed to the prosecutor. But, "[t]his court has also recognized that there may be selectivity in prosecutions and that the exercise of this prosecutorial prerogative does not reach constitutional proportion unless there be a

*Wilkerson*, 257 N.C. App. at 930, 810 S.E.2d at 392); *Spivey*, 357 N.C. at 117, 579 S.E.2d at 254 (quotation omitted) ("[I]n assessing defendant's speedy trial claim, we see no indication that court resources were either negligently or purposefully underutilized."). There is no evidence the State intentionally delayed Defendant's trial; there is ample evidence the State was preparing to prosecute Defendant. The State has "fully explain[ed] the reason for the delay." *Farmer*, 376 N.C. at 415, 852 S.E.2d at 341.

¶ 65    The delay between Defendant's first mistrial and second speedy trial motion is also "an incident of ordinary or reasonably necessary delay." *Armistead*, 256 N.C. App. at 239, 807 S.E.2d at 669. The trial court's unchallenged findings establish, after Defendant's first trial, "[t]ranscripts of the trial proceedings were requested, and, through no delay attributable to the District [A]ttorney's [O]ffice, these transcripts took eight months to prepare, and were obtained at the end of 2018." Defendant then filed his second speedy trial motion in April 2019. Between his second and third speedy trial motion in August 2019, "the State was awaiting the resolution of a motion for appropriate relief filed in a co-defendant's matter, to determine whether a trial proceeding against defendant should be joined with those

---

showing that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Spivey*, 357 N.C. at 121, 579 S.E.2d at 256 (discussing prosecutorial preference in trying a backlog of murder cases in the speedy trial context) (quotations omitted).

matters in the event the motion for appropriate relief was granted." Ultimately, the trial court found "[t]he delays in these matters being reached for trial are not purposeful or oppressive, are not owing to any neglect of the District Attorney, and are not intended to hamper the defense or gain a tactical advantage in these matters." The record also indicates the case was continued from February to April 2019 at the agreement of both parties.

¶ 66        For 10 of the 12 months between Defendant's first trial and second speedy trial motion, and 10 of the 16 months between Defendant's first trial and third speedy trial motion, the State could not calendar Defendant's case. If we were to follow Defendant's rule for calculating speedy trial delays, the delay between his arrest and second motion is 38 months and the delay between his arrest and third motion is 42 months. We have already determined the delay leading to the first trial did not violate Defendant's speedy trial rights, and during the delay leading to the second trial 8 months were occupied waiting on transcripts, "through no delay attributable to the District attorney's office"; the proceedings were continued for two months; and between Defendant's second and third motion the State "was awaiting the resolution of a motion for appropriate relief . . . to determine whether a trial proceeding against defendant should be joined" with a co-defendant's matter. Defendant again fails to show "the delay was the result of neglect or willfulness of the prosecution." *Spinks*, ¶ 26 (emphasis omitted) (quotation omitted). Defendant was then tried again at the

42-month mark of his incarceration, resulting in the second mistrial.

¶ 67 The delay between the second and third trials is justified largely by truly neutral factors. The delays prior to the first and second trial may still be considered here. But the second trial took place in August 2019. The third trial occurred in May 2021. During a large portion of 2020, most of the time period between these two trial dates, the Covid-19 pandemic caused significant shutdowns and backlogs in our judicial system. These shutdowns were required by Executive Orders issued by the Governor of North Carolina and by Emergency Directives issued by the Chief Justice of the Supreme Court of North Carolina.[7]

¶ 68 A lengthy delay alone will not weigh against the State, but Defendant is required to show "purposeful" delays or "those which the prosecution could have avoided by reasonable effort." *Spinks*, ¶ 28; *Spivey*, 357 N.C. at 121, 579 S.E.2d at

---

[7] The Chief Justice of the Supreme Court of North Carolina issued multiple orders postponing proceedings, including jury trials, by thirty days in response to the Governor's declaration of a state of emergency due to Covid-19. *See* Order of the Chief Justice Emergency Directives 1 to 2 (13 March 2020); Order of the Chief Justice Emergency Directives 9 to 16 (21 May 2020); Order of the Chief Justice Extending Emergency Directives 9 to 16 (20 June 2020); Order of the Chief Justice Extending Emergency Directives 9-15, 20 (20 July 2020); Order of the Chief Justice Extending Emergency Directives 9-15, 20-22 (15 August 2020); Order of the Chief Justice Extending Emergency Directives 2-6, 8-15, 18, and 20-22 (15 September 2020); Order of the Chief Justice Extending Emergency Directives 2-5, 8-15, 18, and 20-22 (14 December 2020). These orders may be found on the North Carolina Judicial Branch's website at: https://www.nccourts.gov/covid-19. In early 2021 the Chief Justice allowed proceedings to resume on a county-by-county basis depending upon the current state of Covid-19 cases in that county. *See* Order of the Chief Justice Extending Emergency Directives 2, 3, 5, 8, 11, 12, 14, 15, 21 (14 January 2021).

256 ("Indeed, defendant relies solely on the length of delay and ignores the balancing of other factors. In light of these reasons, we conclude that the delay was caused by neutral factors and that defendant failed to carry his burden to show delay caused by the State's neglect or willfulness."). Defendant did not make any allegations of delay based upon Covid-19 shutdowns and did not demonstrate the prosecutor here could have avoided any delay caused by the pandemic, and this delay will not weigh against the State. *Cf. Farmer*, 376 N.C. at 416, 852 S.E.2d at 341-42 (discussing how some neutral factors, like crowded criminal case dockets, weigh against the State because the State has a "more authoritative role in the delay"). Additionally, the record indicates approximately two months of the final delay between Defendant's second and third trials was due in part due to a medical issue suffered by Defendant's own counsel.

While the time periods between Defendant's arrest and trials is lengthy enough to shift the burden to the State, "the State offers a valid reason 'for the lengthy delay of [the] defendant's trial, [and] the burden of proof shift[ed] back to the defendant to show neglect or willfulness by the prosecutor.'" *Spinks*, ¶ 27 (quotation omitted). With respect to each motion, Defendant has not shown any actual neglect or willfulness by the prosecutor in any of the delays between his arrest, trials, and motions. Although there are some reasons for the delay that weigh slightly against the State, the State offered valid reasons for the delay, including delays incident to

normal trial procedure and delays due to the effect of the Covid-19 pandemic on our court system in 2020. This factor does not particularly favor either party, and at best it might slightly favor Defendant, at least prior to 2020.

### d. Defendant's Assertion of the Right

¶ 70 As to the third *Barker* factor, the trial court concluded, "The defendant has first asserted the right to a speedy trial by motion on February 12, 2018, after the matter had been pending for two years, and after acquiescing to the State's approach during the prior two years of addressing the matters of the other co-defendants prior to trying the defendant's cases."

¶ 71 The third *Barker* factor favors Defendant. As the trial court noted, Defendant waited about two years to assert his right to a speedy trial, but at that point, he asserted his right to a speedy trial repeatedly. The State concedes as much.

> "A criminal defendant who vigorously asserts his right to a speedy trial will be considered in a more favorable light than a defendant who does not." *Strickland*, 153 N.C. App. at 587, 570 S.E.2d at 903. A failure to assert the right, or a failure to assert the right early in the process, weighs against a defendant's contention that his right has been violated. [*State v.*] *Grooms*, 353 N.C. [50,] 63, 540 S.E.2d [713,] 722 [(2000)].

*Spinks*, ¶ 33.

¶ 72 Defendant first asserted his right to a speedy trial by a *pro se* motion and letter filed 30 January 2018. His first motion filed through counsel was filed 12 February 2018. Defendant filed three additional speedy trial motions: the second motion on or

about 23 April 2019, after his first mistrial; the third motion on 7 August 2019; and the fourth and final motion on 8 January 2021, between the second mistrial in August 2019 and his third trial in March 2021. Defendant also sent an undated letter to a retired judge, presumably at some point in October 2018, as we can estimate by the trial court's response. Even accepting the State's argument, citing *Spivey*, 357 N.C. at 121, 579 S.E.2d at 256, that "a represented defendant 'cannot also file motions on his own behalf or attempt to represent himself[,]'" Defendant's four motions filed through counsel unequivocally establish he "vigorously assert[ed] his right to a speedy trial . . . ." *Id.*

### e. *Prejudice to the Defendant Resulting from the Delay*

¶ 73 "As to the fourth Barker factor," the trial court concluded, "the alleged delay has not caused any significant prejudice to defendant, and the defendant has not alleged specific prejudice, such as any alleged unavailability of witnesses given the passage of time, in his motion."

¶ 74 We agree that the final factor favors the State:

> Prejudice "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect." *Barker*, 407 U.S. at 532, 92 S. Ct. at 2193, 33 L.Ed.2d at 118. The identified interests the constitutional right to a speedy trial protects are: (1) avoiding prolonged imprisonment; (2) reducing anxiety of the accused; and (3) creating the opportunity for the accused to assert and exercise their presumption of innocence. *See id.* The last of these interests is the most important aspect to the

speedy trial right, "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.*

*Carvalho*, 243 N.C. App. at 403, 777 S.E.2d at 85. "A defendant must show actual, substantial prejudice." *Spivey*, 357 N.C. at 122, 579 S.E.2d at 257.

¶ 75 Defendant has not shown "actual, substantial prejudice." *Id.* The first two interests protected by the right to a speedy trial are evident in nearly all incarcerations. Defendant was imprisoned for several years awaiting trial for the offenses he was ultimately convicted upon, and this imprisonment undoubtably caused significant "anxiety of the accused." *Carvalho*, 243 N.C. App. at 403, 777 S.E.2d at 85. But from arrest through conviction Defendant received three opportunities "to assert and exercise [his] presumption of innocence." *Id.*

¶ 76 Defendant admits his defense was not prejudiced by any delay, "because he did not call witnesses; he instead relied on the fact that the State had no evidence of his participation." Defendant argues he "should not be punished due to the arbitrary factor that his defense was not damaged by the passage of time." Additionally, Defendant argues he was prejudiced because he was "unjustly locked away, unable to work and see and support his family." The State cites *Farmer* and argues "Defendant only cite[s] generalized concerns surrounding detention" and "[t]hese are the exact arguments our Supreme Court already said were not sufficient."

¶ 77 As to Defendant's argument that his incarceration was prejudicial because he

was "unjustly locked away, unable to work and see and support his family[,]" Defendant is required to allege more than simple separation from his family, or the type of separation inherent to pretrial detention. *See Spinks*, ¶ 38 (discussing *State v. Washington*, 192 N.C. App. 277, 292, 665 S.E.2d 799, 809 (2008)). Defendant has not alleged any reason why separation from his family was particularly prejudicial as a result of the delays before his trial. He has not argued how that separation affects any of the interests protected by the right to a speedy trial above the prejudice inherent in every pretrial incarceration. Defendant instead makes a bare assertion that separation from his family was "unjust . . . given the weakness of the State's case . . . ." This argument falls short of "actual, substantial prejudice." *Spivey*, 357 N.C. at 122, 579 S.E.2d at 257.

¶ 78    Defendant also argues that he is prejudiced because none of his time spent in State jail will count against his future federal sentence. Defendant does not expand upon this argument. We find this argument unpersuasive. It is not uncommon for a criminal defendant to serve consecutive sentences for multiple offenses or for a defendant to be prosecuted by both State and Federal authorities. And, as we discussed above, the State's evidence was sufficient to convict Defendant on all three charges. Although "[t]he fact a defendant is already incarcerated while awaiting trial 'does not mitigate against his right to a speedy and impartial trial[,]'" *Wilkerson*, 257 N.C. App. at 934, 810 S.E.2d at 395 (quotation omitted), Defendant does not explain

how this future sentence constitutes prejudice protected against by his right to a speedy trial. He does not allege the possibility of a concurrent sentence being lost, or an increase in his present imprisonment, or any worsening of the conditions of his imprisonment due to the "pendency of another criminal charge outstanding against him." *Id.* (quoting *Smith v. Hooey*, 393 U.S. 374, 378, 21 L. Ed. 2d 607, 611 (1969)). The fact that Defendant will have to serve a federal sentence in addition to his state sentence does not constitute "actual, substantial prejudice" as Defendant presents it to us. *Spivey*, 357 N.C. at 122, 579 S.E.2d at 257.

¶ 79      As to Defendant's argument that he "should not be punished due to the arbitrary factor that his defense was not damaged by the passage of time[,]" we do not find that Defendant is being punished because this case took several years and multiple trials to resolve or because he did not present evidence in his defense. Defendant has failed to show any prejudice that is not inherent to all pretrial detentions, and ultimately the only showing of prejudice is Defendant's lengthy incarceration alone. While we acknowledge the oppressive and anxiety-inducing nature of pretrial incarceration, it is not enough by itself to show "actual, substantial prejudice." This factor weighs in favor of the State.

### f. *Weighing the Factors*

¶ 80      The reasons for the delay were not solely the fault of the State. Defendant has not presented evidence to show the delay was due to "neglect or willfulness by the

prosecutor." *Spinks*, ¶ 27 (quotation omitted). While *Farmer* indicates the State bears some burden for the exercise of prosecutorial preference in the order Defendant and co-defendants were tried, *see Farmer*, 376 N.C. at 416, 852 S.E.2d at 342, "[t]his Court has also recognized that there may be selectivity in prosecutions and that the exercise of this prosecutorial prerogative does not reach constitutional proportion unless there be a showing that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Spivey*, 357 N.C. at 121, 579 S.E.2d at 256 (quotations omitted) (discussing the effect of prosecutorial preference in trying capital versus noncapital murder cases).

¶ 81        "No one factor is determinative of a speedy-trial violation; 'they must all be weighed and considered together[.]'" *Spinks*, ¶ 41 (alteration in original) (quotation omitted). Here, the balance of the factors weighs in favor of the State. Defendant has failed to show purposeful, neglectful, or willful delay by the prosecutor. Defendant has also failed to show "actual, substantial prejudice" as a result of any delay. *Spivey*, 357 N.C. at 122, 579 S.E.2d at 257. Upon *de novo* review, we hold the trial court did not err in balancing the *Barker* factors as to any of Defendant's motions and denying his motions to dismiss based upon denial of his right to a speedy trial.

### III.    Conclusion

¶ 82        We conclude the State presented sufficient evidence to convict Defendant on each charge and the trial court did not err in denying Defendant's motions to dismiss

based upon his assertion of a denial of his right to a speedy trial.  The trial court

committed no error.

NO ERROR.

Judges TYSON and HAMPSON concur.